CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 12, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| Antwhon Suiter, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 5:24-cv-00054 |
| | ) |
| GM - General Motors, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter is before the court on Defendant GM - General Motors, LLC's ("GM") motion to dismiss, (Dkt. 37), the Report and Recommendation ("R&R") of United States Magistrate Judge Joel C. Hoppe concerning that motion, (Dkt. 54), and Plaintiff Antwhon Suiter's Objections to the R&R ("Objections"), (Dkt. 57). Pursuant to 28 U.S.C. § 636(b)(1)(B), this matter was referred to Judge Hoppe for a recommended disposition. On February 24, 2026, Judge Hoppe entered an R&R recommending that this court grant GM's motion as to Counts II, III, V, VI, and the breach of express warranty claim in Count I. However, he recommended that the court deny the motion without prejudice as to the breach of implied warranty claim in Count I. Suiter, proceeding *pro se*, filed objections to the R&R, and GM filed a brief in response to the objections.

For the following reasons, the court will overrule Suiter's objections and adopt Judge Hoppe's R&R in its entirety.

# I.    Background

## A. Factual History

### 1.    Amended Complaint and Incorporated Documents[1]

On July 20, 2022, Suiter bought a used 2018 GM Chevrolet Malibu, Vehicle Identification Number ("VIN") 1G1ZD5ST5JF186612 ("the subject vehicle"), from Jim Price Chevrolet in Charlottesville, Virginia. (Am. Compl. at 1, 3 (Dkt. 26).) After being sold to an initial owner, the vehicle was "resold" to Suiter as a Certified Pre-Owned ("CPO") vehicle. (*Id.* at 1.) GM "provided express and implied warranties for the vehicle, assuring that it was free from defects and would function as warranted." (*Id.* at 6.)

Suiter experienced "normal wear and tear" of the subject vehicle for approximately two years following his purchase. (*Id.* at 3.) However, in May or June of 2024, Suiter "began to notice numerous serious defects, not caused by normal wear and tear." (*Id.*) Specifically, Suiter noticed the following defects: (1) a "[c]rack in the third brake light, allowing water damage into the vehicle's interior" including "mold and mildew buildup and also interior cosmetic damage on the ceiling"; (2) "[t]he vehicle fails to lock into park, with the message system notifying that the vehicle is not in park, even when it is turned off and in the park position"; and (3) issues with the "front end" involving "shaking while braking, breaking wheel studs, and uneven tire wear despite multiple alignments." (*Id.* at 4–5.)

---

[1] Except where otherwise noted, the following facts are taken from Suiter's Amended Complaint, (Dkt. 26), and are assumed to be true for purposes of resolving GM's motion to dismiss Counts III, V, and VI. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

None of the identified defects have been repaired as of the filing of the complaint.  (*Id.*)

Suiter alleges that he has "made numerous" attempts to fix these defects, but that he has "been

ignored by his local dealership" and waited for an appointment for "weeks upon weeks."  (*Id.*

at 3.)  However, Suiter includes "Repair Attempts: None" in his description of each of the

first two alleged defects—the brake light crack and failure to lock in park.  (*Id.* at 4–5.)

Conversely, for the third defect (shaking and instability during braking), Suiter states that

"[n]umerous attempts have been made to fix this issue."  (*Id.* at 5.)

At an unspecified time, a member of GM's Executive Resolution Team offered Suiter

a $1,500 "Discount Voucher."  (*Id.* at 4.)  However, Suiter turned the voucher down because

it "does not address [his] claims," this vehicle, "or [his] financial losses which prompted this

suit."  (*Id.*)

Suiter alleges that GM knew of the subject vehicle's defects, as demonstrated by

"consumer complaints and Bulletins," and it nevertheless continued to sell the vehicle along

with other 2018 Chevrolet Malibu models.  (*Id.* at 3–4.)  Specifically for the second failure to

lock in park defect, GM issued a May 2021 Technical Service Bulletin, #19-NA-206,[2] which

discussed the issue of drivers seeing a "Shift to Park" message even after the vehicle has been

shifted into park and the ignition turned off.  (*Id.* at 3; *see* Dkt. 38-3.)  The Bulletin, first issued

---

[2] GM attached a copy of the #19-NA-206 Bulletin to its motion to dismiss.  (Dkt. 38-3.)  Suiter explicitly relies on this document in the amended complaint as evidence of GM's knowledge of the "Shift to Park" defect.  (Am. Compl. at 3 ("Specifically, GM issued Technical Service Bulletin (TSB) #19-NA-206, which acknowledges the 'Shift to Park' defect.").)  Suiter does not challenge the authenticity of GM's attachment.  Accordingly, the court may consider this document for purposes of resolving the motion to dismiss Counts III, V, and VI.  *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)) ("Consideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is 'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge [the document's] authenticity.'").  And because Suiter did not object to the exhibit under Rule 56(c), it may also be included in the summary judgment record.  *See McCloud v. Rice*, No. 4:20-cv-00004, 2022 WL 18146043, at *3 (E.D. Va. Dec. 21, 2022).

in September 2019 and updated consistently in the following two years, (*see* Dkt. 38-3 at 8), notes that this "Shift to Park" issue may pertain to Chevrolet Malibu Model Years 2016 through 2019, among other Chevrolet car models, (*id.* at 1).  It explains that "[t]he cause of the condition may be that the park switch in the transmission control (shifter) assembly is not pulling the BCM signal low to electronically show that the vehicle is in the Park position." (*Id.*)  The Bulletin then provides a detailed step-by-step guide for how professional technicians can correct the condition, which involves installing several new parts in the transmission control.  (*Id.* at 1–8.)

Moreover, the Bulletin instructs the reader to "[r]eference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information."  (*Id.* at 8.)  At the bottom of the last page, the Bulletin states that the intended audience is "professional technicians, NOT a 'do-it-yourselfer.'"  (*Id.*)  It cautions that "[i]f a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition."  (*Id.*)  Although Suiter generally alleges that GM knew about the defects, (Am. Compl. at 3–4), he does not point to any additional bulletins, cite any specific consumer complaints, or allege any specific facts showing GM's knowledge of the cracked brake light or the shaking while braking defects.

2.  <u>Partial Summary Judgment Record</u>[3]

On April 21, 2018, Lasorsa Chevrolet Inc. sold the 2018 Chevrolet Malibu subject vehicle to Dolly Ina Adams.  (Lasorsa Decl. ¶ 4 (Dkt. 49-1); Dkt. 49-2 at 1–2.)  Adams was the "original purchaser," and the sale was "completed as a new vehicle sale."  (Lasorsa Decl. ¶¶ 4–5; *see* Dkt. 49-2 at 1.)  Adams "took delivery of the [subject] vehicle on or about April 21, 2018."[4]  (Lasorsa Decl. ¶ 5.)  Over four years after the delivery to Adams, on July 20, 2022, Suiter purchased the same vehicle from Jim Price Chevrolet.  (*See* Dkt. 38-1; Am. Compl. at 1, 3.)  The vehicle was delivered on July 20, 2022.  (Dkt. 38-1 at 1; Dkt. 48 at 2.)

This vehicle was covered by GM's "New Vehicle Limited Warranty," which includes "Bumper-to-Bumper" coverage and "Powertrain" coverage.  (*See* Dkt. 38-2 at 2; Dkt. 38-4 at 3–4, 6.)  According to the 2018 Chevrolet Limited Warranty and Owner Assistance Information booklet, the Bumper-to-Bumper coverage lasts "for the first 3 years or 36,000 miles, whichever comes first."  (Dkt. 38-2 at 2.)  The Powertrain coverage "is provided for 5 years or 60,000 miles, whichever comes first."  (*Id.*)  The vehicle was also covered by a Certified Pre-Owned Limited Warranty and a Certified Pre-Owned Powertrain Limited Warranty ("CPO Limited Warranties").  (*See* Dkt. 38-4 at 3–4, 7.)[5]

---

[3] The following facts pertain to GM's motion to dismiss Counts I and II, which was converted to a motion for summary judgment on these counts.  (Dkt. 47.)  The facts are derived from the exhibits and evidence submitted by both parties.  (*See* Dkts. 38-1–38-4, 42-1, 42-2, 48-1–48-5, 49-1–49-2.)

[4] Suiter disputes whether the warranty coverage period and lemon law rights period began on the 2018 delivery date or the 2022 delivery date, (Dkt. 48 at 2, 5–7), but does not dispute the fact that the subject vehicle was first sold to Adams in 2018.  Although he states that he "has not deposed Barra or accessed GM's internal records to challenge the 2018 delivery date's authenticity or relevance," he does not affirmatively dispute the fact of the 2018 sale.  (Dkt. 48 at 6.)

[5] While parties disagree on when these warranties first began to run and when they expired for Suiter's vehicle, (*see* Dkt. 38 at 4–5; Dkt. 42-1 at 5–6; Dkt. 48 at 2, 5–7), it is generally undisputed that the New Vehicle Limited Warranty and CPO Limited Warranties covered the vehicle at some point and for the period outlined in the booklet.

GM provided a sworn declaration from its Customer Resource Manager Richard Fuentes, in which he notes the dates of delivery and expiration of the warranties at issue. (*Id.* at 3–4.) Specifically, Fuentes states that the vehicle "was delivered to or put in use by the first retail purchaser" on April 21, 2018. (*Id.* at 3.) He gathers the expiration dates of the applicable warranties from the subject vehicle's "View Vehicle Summary" in GM's "Global Warranty Management System." (*Id.* at 2–3.) This system tracks the warranties covering GM vehicles in North America based on information sent from authorized GM dealerships, and the summaries are "created when the new vehicle is completed and updated when the vehicle is first sold to a retail customer." (*Id.* at 3.) Then, the summary is updated "each time warranty repairs are performed on the vehicle and submitted to GM for payment." (*Id.*) The expiration dates are listed as follows:

- Bumper-to-Bumper Limited Warranty: April 21, 2021 or at 36,001 miles
- Powertrain Limited Warranty: April 21, 2023 or at 60,001 miles
- Certified Pre-Owned Limited Warranty: July 20, 2023 or at 40,005 miles
- Certified Pre-Owned Powertrain Limited Warranty: April 21, 2024 or at 100,001 miles

(Dkt. 38-4 at 3–4.) Each of the warranties expires either on the specified date or when the particular mileage is met, whichever occurs first. (*See id.*; Dkt. 38-2 at 2.)

## B. Procedural History

Suiter, proceeding *pro se*, brought this action against GM, Mary Barra, and Chevrolet on July 25, 2024. (Dkt. 1.) His complaint alleged that the Defendants were liable for a variety of tort, contract, and statutory causes of action following his 2022 purchase of a used 2018 Chevrolet Malibu. (*Id.*) After a dispute over service of process, (Dkts. 8–11, 13–15), the court

found that Suiter's service of the initial complaint did not comply with the requirements under Federal Rule of Civil Procedure 4, (Dkt. 24 at 9–11). However, the court granted Suiter leave to amend the complaint and directed him to serve his amended complaint in accordance with Rule 4. (*Id.* at 12–13.)

On March 20, 2025, Suiter filed his amended complaint, which removed Chevrolet as a named Defendant. (Am. Compl.) The amended complaint alleges six causes of action: breach of warranty under the Magnuson-Moss Warranty Act ("MMWA") (Count I), violation of the Virginia Lemon Law or Virginia Motor Vehicle Warranty Enforcement Act ("VMVWEA") (Count II), negligent manufacture and design defect (Count III), supervisory liability against Defendant Barra (Count IV),[6] violation of the Virginia Consumer Protection Act ("VCPA") (Count V), and fraudulent concealment (Count VI). (Am. Compl. at 6–8.) It seeks compensatory and punitive damages in an unspecified amount, injunctions requiring GM to buy back the vehicle from Suiter and provide a replacement vehicle, and additional fees and costs under MMWA and VMVWEA. (*Id.* at 9–10.)

GM was served on July 18, 2025. (Dkt. 34.) GM timely filed a motion to dismiss Suiter's amended complaint on August 8. (Dkt. 37.) The motion to dismiss included four attached exhibits: (1) a copy of the Virginia Buyers Order showing the July 20, 2022, sale of a 2018 Chevrolet Malibu by Jim Price Chevrolet to Antwhon Suiter, (Dkt. 38-1); (2) Chevrolet's 2018 Limited Warranty Booklet, (Dkt. 38-2); (3) a May 2021 GM Service Bulletin, (Dkt. 38-

---

[6] In response to Suiter's amended complaint, Defendant Barra filed a motion to dismiss pursuant to Rule 12(b)(5). (Dkt. 35.) On January 14, the court adopted Judge Hoppe's recommendation to grant the motion and dismissed Barra from the action. (Dkt. 53.) Therefore, Count IV—which is only brought against Barra in her individual capacity, (Am. Compl. at 2, 7–8)—is not at issue in the R&R or in Suiter's Objections.

3); and (4) the Declaration of Richard Fuentes, a GM Customer Resource Manager, along with GM's "View Vehicle Summary" for the 2018 Chevrolet Malibu, VIN 1G1ZD5ST5JF186612, (Dkt. 38-4).

Suiter filed a response to the motion a few days later, (Dkts. 42, 42-1), to which he appended his own sworn affidavit, (Dkt. 42-2). Defendants filed a motion to strike this response for "citing cases that may have been hallucinated by artificial intelligence ("AI") and that are nonexistent." (Dkt. 43.) Judge Hoppe later acknowledged these issues with the brief but denied the motion to strike because "Suiter is not an attorney and his brief responds directly to the merits of GM's dispositive motion." (Dkt. 55.)

Additionally, on October 6, Judge Hoppe entered an order directing both GM and Suiter to "submit all the material pertinent to establishing the date or dates of delivery" of the vehicle for purposes of determining whether "the applicable warranty periods expired" for Count I and whether "the 'lemon law rights period' expired" for Count II, such that the claims were time-barred. (Dkt. 47 at 2.) Citing Federal Rule of Civil Procedure 12(d), the order explained that, given GM's warranty period and lemon law rights period defenses, as well as the documents attached to GM's motion, the motion to dismiss Counts I and II will instead be treated as a Rule 56 motion for summary judgment. (*Id.*) The rest of the Counts are subject to the original Rule 12(b)(6) motion to dismiss standards. (*Id.* at 2–3.)

Suiter submitted additional exhibits on October 9, which included: (1) Suiter's declaration, (Dkt. 48 at 8); (2) copies of the Buyers Order dated July 20, 2022, (Dkt. 48 at 4;

Dkts. 48-1, 48-2)[7]; (3) a copy of the May 2021 GM "Service Bulletin," (Dkt. 48-3); and (4) an

email exchange between Suiter and a "Chevrolet Executive Resolution Liaison," (Dkts. 48-4,

48-5). GM submitted, in addition to the documents attached to its motion to dismiss, (Dkts.

38-1, 38-2, 38-3, 38-4), two additional documents: (1) the Declaration of John Lasorsa,

employee of Lasorsa Chevrolet, (Dkt. 49-1); and (2) the New York "Retail Certificate of Sale"

showing the Lasorsa Chevrolet sale of a new 2018 Chevrolet Malibu to Dolly Adams on April

21, 2018, (Dkt. 49-2). The next day, Suiter filed a "Notice of Supplemental Authority" listing

cases that have addressed tolling of limitations periods and the effect of latent defects on

warranty claims. (Dkt. 50.)

On February 24, 2026, Judge Hoppe issued his R&R analyzing GM's motion to dismiss

that had been converted in part to a motion for summary judgment. (R&R (Dkt. 54).) He

recommended that the district judge "grant GM's dispositive motion as to Counts II, III, V,

VI, and the breach of express warranty claim in Count I, but deny the motion without

prejudice as to the breach of implied warranty claim in Count I." (*Id.* at 1–2 (emphases and

citation omitted).) On February 25, Suiter filed objections to the R&R. (Pl.'s Objs. (Dkt. 57).)

On March 11, GM filed a response to the objections. (Dkt. 58.)

---

[7] Suiter attaches his copies of the Buyers Order as evidence of the date of purchase, (*see* Dkt. 48 at 2), but the signature and date in Suiter's copies are largely illegible, (*see* Dkts. 48-1, 48-2). GM provides a copy of the same Buyers Order as an attachment to its motion to dismiss, in which the signature, date, and entire page is legible. (Dkt. 38-1.) Suiter does not dispute the accuracy of GM's submitted Order or its depicted date of sale. Therefore, the court will rely on this copy as evidence of the date of the Chevrolet Malibu sale on July 20, 2022. *See Thweatt v. Brennan*, No. 3:18-cv-00574, 2019 WL 459701, at *1 n.1 (E.D. Va. Feb. 5, 2019) (considering documents attached to a motion to dismiss converted to motion for summary judgment where the documents were "relevant to the resolution of [the] case and because Plaintiff has not disputed their accuracy in her Response in Opposition").

## II.    Standard of Review

### A. Objections to Report and Recommendation

A district court may delegate a dispositive motion to a magistrate judge, who then "submit[s] to [the district court] proposed findings of fact and recommendations for the disposition" of the motion.  28 U.S.C. § 636(b)(1)(B).  For a limited period after the issuance of the magistrate judge's report and recommendation, "any party may serve and file written objections to such proposed findings and recommendations."  *Id.* § 636(b)(1)(C).  Absent objection by either party, the district court reviews the magistrate's recommendation for clear error.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

A party may "trigger de novo review" by "object[ing] to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection."  *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023) (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)); *see* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").  District courts are not, however, "expected to relitigate entire cases to determine the basis of a litigant's objection."  *Elijah*, 66 F.4th at 460.  Upon review, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).

Additionally, the Supreme Court instructs courts to liberally construe *pro se* filings.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  This includes *pro se* objections to a magistrate's

- 10 -

recommendation, where "district courts must review de novo any articulated grounds to which the litigant appears to take issue." *Elijah*, 66 F.4th at 460–61.

## B. Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) motions to dismiss test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing a Rule 12(b)(6) motion to dismiss, the court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

If the district court considers matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, the Fourth Circuit has held that courts can consider a document attached to a motion to dismiss without converting it to a motion for summary judgment when the document is "'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge [the

document's] authenticity.'" *Zak*, 780 F.3d at 607 (quoting *Am. Chiropractic Ass'n*, 367 F.3d at 234).

Moreover, "a pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). This rule "allows courts to recognize claims despite various formal deficiencies, such as incorrect labels or lack of cited legal authority." *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022). However, liberal construction does not "transform the court into an advocate" for *pro se* parties. *Weller v. Dep't of Soc. Servs. for City of Balt.*, 901 F.2d 387, 391 (4th Cir. 1990).

## C. Rule 56 Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court should only grant summary judgment if "no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).

When resolving a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.    Analysis

Suiter raises objections to the R&R's proposed findings and recommendations for the Count I MMWA express warranty claim, the Count III negligence claim, and "any analysis that treats the April 2018 delivery date as dispositive." (Pl.'s Objs. at 4.) The court will address each objection in turn, applying a *de novo* standard of review to the relevant portions of the R&R. The court will then review all other proposed findings and recommendations in the R&R for clear error.

### A. Suiter's Objections to the Count I Express Warranty Claim

In Count I of his amended complaint, Suiter alleges that GM failed to honor its "express warranties" for the subject vehicle "by not repairing the defects despite multiple requests and repair attempts." (Am. Compl. at 6.) GM seeks to dismiss this claim, as "the subject vehicle was beyond all of GM's warranty coverage periods at the time Plaintiff admits to experiencing the alleged defects in the subject vehicle," (Dkt. 38 at 4)—in "about May/June of 2024," (Am. Compl. at 3). In the R&R, Judge Hoppe concludes that "GM's exhibits establish that all four [applicable] warranty periods expired on or before April 21, 2024." (R&R at 16.) He reasons that because Suiter did not "produce evidence (viewed in his favor) sufficient to establish a genuine dispute that GM was, in fact, still obligated under the express warranties to fix the alleged defects" when he discovered them in May or June of 2024, Suiter is unable to show that a genuine dispute of material fact remains as to the express warranty claim in Count I. (*Id.* at 16–17.)

1.  <u>"Improper Resolution of Factual Disputes" Objection</u>

Suiter's first objection asserts that the issue of "[w]hether GM's CPO representations constituted new or continuing warranty assurances is a fact question inappropriate for resolution on summary judgment." (Pl.'s Objs. at 2.)  While it is unclear what exactly "GM's CPO representations" refers to, Suiter appears to be challenging the R&R's determination that there is no genuine issue of material fact as to whether GM's express warranties, including CPO warranties, expired by the time the subject vehicle's defects emerged.  (R&R at 16–18.)

The MMWA creates a federal cause of action for "a consumer who is damaged by the failure of a supplier . . . to comply with any obligation . . . under a written warranty, implied warranty, or service contract."  15 U.S.C. § 2310(d)(1).  Suiter's objection to Count I pertains to GM's alleged noncompliance with *written* (or express) warranties covering the subject vehicle.  (Pl.'s Objs. at 2.)  These types of MMWA claims borrow from state-law breach of warranty claims.  *See Sadler v. Pella Corp.*, 146 F. Supp. 3d 734, 760 (D.S.C. 2015) ("The parties agree that whether plaintiffs' MMWA claim is cognizable depends on whether the state law warranty claims are cognizable."); *see also Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 291 (4th Cir. 1989) (explaining that the MMWA "operates *in conjunction with state law* to regulate the warranting of consumer products" (emphasis in original)).

Under Virginia law, the warranty coverage period "circumscribes the interval of time within which the warranty exists."  *Harbour Gate Owners' Ass'n, Inc. v. Berg*, 348 S.E.2d 252, 257 (Va. 1986).  If a breach of warranty occurs *before* the warranty expires, a cause of action accrues.  *Id.*; *see Cohan v. Pella Corp.*, No. 2:14-MN-00001-DCN, 2015 WL 6465639, at *11 (D.S.C. Oct.

- 14 -

26, 2015) (collecting cases showing that "[c]ourts have held that a breach of express warranty claim necessarily must accrue before the warranty period expires"). However, if the written "warranty period expire[s] before the defects [are] discovered," the plaintiff "do[es] not assert a cause of action under the warranties." *Yarrington v. Busch Props., Inc.*, No. 4:09-cv-00045, 2010 WL 11565738, at *9 (E.D. Va. Feb. 12, 2010).

> i.   *Bumper-to-Bumper, Powertrain, CPO, and CPO Powertrain Limited Warranties*

Both parties agree that, at one point, several written CPO warranties covered the subject vehicle and the particular types of defects that Suiter alleges. GM specifically recognizes that the cracked brake light, failure to lock when parked, and shaking while braking issues are generally "covered by the Bumper-to-Bumper Limited Warranty, Powertrain Limited Warranty, the CPO Limited Warranty, and the CPO Powertrain Limited Warranty." (Dkt. 38 at 3 n.2; *see* Dkt. 38-2 at 2.) However, Suiter fails to rebut GM's showing that the warranty period for each of these coverages expired before Suiter experienced any defects, such that there is no material factual dispute remaining as to whether GM had any contractual obligation to repair the alleged defects under the express warranties.

The 2018 Chevrolet information booklet evidence proffered by GM, to which Suiter did not object as inadmissible, states that "[t]he warranty period for all coverages begins *on the date the vehicle is first delivered or put in use*." (Dkt. 38-2 at 4 (emphasis added).) The New Vehicle Limited Warranties extend "to the original and any subsequent owners of the vehicle *during the warranty period*." (*Id.* (emphasis added).) GM also offers evidence that the car was initially delivered to Adams on April 21, 2018, (Dkts. 49-1, 49-2), and Suiter neither presents evidence

rebutting this first delivery date nor challenges the documents' admissibility.  Instead, he relies

on naked and conclusory assertions that July 20, 2022—the date he bought the used vehicle—

is the delivery date on which the warranty period first accrues.  (Dkt. 48 at 2, 4–5.)  Without

any supporting evidence, Suiter is unable to establish a genuine dispute of material fact as to

whether the vehicle was first delivered on April 21, 2018, triggering the "warranty period for

all coverages."  (Dkt. 38-2 at 4); *see Abeles v. Metro. Washington Airports Auth.*, 676 F. App'x 170,

173 (4th Cir. 2017) ("The nonmoving party bears the burden of demonstrating a genuine issue

of material fact for trial; conclusory or speculative allegations do not suffice.").

 The warranty period for all coverages "ends at the expiration of the coverage period,"

which is a maximum of three years for Bumper-to-Bumper coverage, and five years for

Powertrain coverage.  (Dkt. 38-2 at 2.)  Because the car was initially delivered to Adams on

April 21, 2018, (Dkts. 49-1, 49-2), the Bumper-to-Bumper coverage of Suiter's vehicle expired

on April 21, 2021, at the latest, and the Powertrain coverage expired on or before April 21,

2023.  (*See* Dkt. 38-4 at 6–7.)  Additionally, although the precise start dates of the CPO

warranties are unclear based on the summary judgment record, GM provides evidence that

these warranties expired "on July 20, 2023 or at 40,005 miles whichever occurred first," and

"when the vehicle reached 100,001 miles or on April 21, 2024, whichever occurred first."  (*Id.*

at 3–4, 7.)  Therefore, based on GM's evidence, all written warranties ended before Suiter's

defects arose in May or June of 2024.  Once again, Suiter is unable to point to any facts in the

record showing that these warranties have not yet expired, such that there is no *factual* dispute

about the expiration date.

- 16 -

Instead, Suiter cites a list of cases for the proposition that the express warranty periods should be restarted on the date that the CPO subject vehicle was delivered to Suiter in 2022. (*See* Dkt. 48 at 5; Dkt. 50 at 1–5.)  At the outset, the court notes that almost all these cases—along with many other cases cited in Suiter's filings—are mischaracterized.  Suiter includes numerous quotes that do not exist in the cited cases, and his briefs contain characteristics that the court has observed in filings made with generative artificial intelligence programs. Regardless of whether Suiter used these tools, submitting a filing containing fabricated authority or nonexistent quotes is unacceptable and "causes an enormous waste of judicial resources."  *Powhatan Cnty. Sch. Bd. v. Skinger*, No. 3:24-cv-00874, 2025 WL 1559593, at *10 (E.D. Va. June 2, 2025).  Such a filing could also constitute a violation of Federal Rule of Civil Procedure 11, for which the court may impose sanctions.  *See* Fed. R. Civ. P. 11(b)–(c).

The court is sympathetic to the challenges associated with navigating the court system as a *pro se* litigant and concludes that a warning is appropriate at this time.  However, Suiter is advised that if any of his future filings fabricate or misrepresent authorities, the court may order him to show cause why he should not face sanctions under Rule 11.  *See* Fed. R. Civ. P. 11(c)(3).  Sanctions could include the striking of filings, filing restrictions, monetary penalties, or the dismissal of his action.  Overall, Suiter does not offer any legal authority requiring the tolling or restarting of a manufacturer's warranty period simply because a vehicle is sold as "Certified Pre-Owned" or based on general representations that the CPO vehicle is "'like new,' fully inspected, and free from defects."  (Dkt. 50 at 4.)

- 17 -

The court agrees with the magistrate's determination of the subject vehicle's express warranty periods, including those specifically denoted for CPO vehicles.  The summary judgment record supports the conclusion that the Bumper-to-Bumper, Powertrain, CPO, and CPO Powertrain Limited Warranty periods ended on or before April 21, 2024.  (Dkt. 38-4 at 3–4, 6–7.)  Suiter is unable to demonstrate that a genuine dispute of material fact remains as to these start and end dates.  Accordingly, no reasonable jury could find that GM had any existing obligation under the written warranties to fix Suiter's alleged defects by the time he noticed them in May or June of 2025.  *See Park Place Corp. v. Seaman Corp.*, 169 F. Supp. 3d 635, 647 (D.S.C. 2016) (granting defendant summary judgment on plaintiff's breach of warranty claim because plaintiff "has not produced evidence of any leak *it reported during the term of the warranty* and which [defendant] failed to repair" (emphasis added)).

ii.    *Lack of Additional Express or Written Warranties*

Furthermore, Suiter cites "CPO representations constitut[ing] new or continuing warranty assurances" in his objections.  (Pl.'s Objs. at 2.)  To the extent that he is referring to warranties separate from the CPO Limited Warranty and CPO Powertrain Limited Warranty, (Dkt. 38-4 at 3–4, 6–7), he has not provided any evidence suggesting the existence of additional written warranties that could serve as the basis for his MMWA claim.  In his affidavit and declaration, Suiter does allude to general representations that GM made to Suiter "[a]t the time of purchase."  (Dkt. 42-2 at 1–2 ("At the time of purchase, GM, through its agents and representatives, presented the vehicle as being in perfect condition and free from defects."); *see* Dkt. 48 at 8 (stating that the vehicle was "sold to [him] as a GM Certified Pre-Owned car,

- 18 -

presented as 'like new' and inspected by GM's certification process'').)    Even if these GM statements were made in writing, they do not provide a basis for written warranty liability under the MMWA, as "promises about a product's quality or character do not constitute a 'written warranty' unless they promise a specified level of performance over a specified period of time." *Kruglyak v. Home Depot U.S.A., Inc.*, 750 F. Supp. 3d 644, 664 (W.D. Va. 2024) (cleaned up).    Therefore, to the extent that the "CPO representations" in Suiter's objection refer to express warranties separate from the Bumper-to-Bumper, Powertrain, CPO, and CPO Powertrain Limited Warranties, these representations do not promise a specific level of performance over a specific period of time, and thus do not support Suiter's MMWA express warranty claim.

   iii.  *Consideration of Summary Judgment Record Evidence*

   In his objection, Suiter also states that "[t]he R&R relies substantially on": (1) the "Fuentes Declaration," (2) "GM's internal Vehicle Summary," and (3) "[a]n asserted 'first retail delivery' date of April 21, 2018." (Pl.'s Objs. at 2.)    He then lists the evidence that "Plaintiff submitted"—specifically, the Buyers Order, Suiter's sworn affidavit, "[e]vidence concerning representations made at the time of sale," and "[e]vidence that the vehicle was sold as a Certified Pre-Owned . . . vehicle to Plaintiff in 2022." (*Id.*)    Construing the objection liberally, if Suiter is challenging the fact that the R&R relied on the listed GM exhibits—the Fuentes Declaration, (Dkt. 38-4 at 2–4), the GM Vehicle Summary, (*id.* at 6–7), or the documents showing the April 21, 2018, delivery date, (Dkts. 38-4, 49-1, 49-2)—in analyzing Count I, the court will overrule this objection.    Suiter has not raised any Rule 56 objections to the

admissibility of GM's proffered evidence in his briefs.[8]  Thus, the R&R properly considered these documents in determining whether there exists a genuine issue of material fact as to the express warranty expiration before Suiter noticed the alleged defects.  *See McCloud v. Rice*, No. 4:20-cv-00004, 2022 WL 18146043, at *3 (E.D. Va. Dec. 21, 2022) ("Absent an objection [under Federal Rule of Civil Procedure 56(c)], the court may simply consider the proffered evidence.").

Furthermore, to the extent that Suiter is arguing that his own evidence was not adequately considered, the R&R expressly referenced Suiter's exhibits, including the Buyers Order, (Dkts. 48-1, 48-2), the GM Bulletin, (Dkt. 48-3), and the emails with the Chevrolet Executive Resolution Team, (Dkts. 48-4, 48-5), in its Count I analysis of the express warranty period.  (*See* R&R at 16–17.)  The court agrees with the R&R's conclusion that that Suiter's "cited documents contain no information about warranty expiration dates," such that there is no factual dispute about such dates.  (*Id.* at 17.)  The Buyers Order merely shows the undisputed date on which the subject vehicle was sold to Suiter in 2022.  (Dkts. 48-1, 48-2; *see* Dkt. 38-1.)  The GM Bulletin says nothing about expiration dates, (Dkt. 48-3), and the emails with Chevrolet staff merely show that Suiter reached out at some point before July 16, 2024

---

[8] Suiter briefly asserts that "Plaintiff has not deposed Barra or accessed GM's internal records to challenge the 2018 delivery date's authenticity or relevance." (Dkt. 48 at 6.)  However, Suiter does not provide any arguments as to why the documents are not admissible for purposes of resolving the summary judgment motion.  *See* Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party *cannot produce admissible evidence to support the fact*." (emphasis added)).  Nor does he provide any evidence that rebuts this initial 2018 delivery date.  *See id.* 56(c)(1)(A).  Suiter also states that the Fuentes Declaration and Vehicle Summary "are neither referenced in nor integral to Plaintiff's Amended Complaint, and GM offers no admissible proof that Plaintiff had notice of those materials."  (Dkt. 48 at 2.)  However, because the motion to dismiss was converted to a motion for summary judgment as to Count I under Rule 12(d), (Dkt. 47), these documents need not be referenced in or integral to the amended complaint to be considered.  Further, there is no rule requiring GM to give Suiter notice of the materials prior to including them in the motion.

about his car, (Dkt. 48-4 at 1). Suiter's affidavit is similarly devoid of facts pertinent to the warranty expiration date. (*See* Dkt. 42-2.)

As for Suiter's evidence that he supposedly submitted "concerning representations made at the time of sale" or "that the vehicle was sold as a Certified Pre-Owned vehicle," (Pl.'s Objs. at 2), the court is unclear what exactly Suiter refers to in this objection. The court does not locate any additional evidence in the record that would impact its determination as to whether the express warranty period expired before Suiter experienced the subject vehicle defects. Besides the Buyers Order, (Dkts. 48-1, 48-2), which the R&R references in its Count I analysis, the only other evidence Suiter provided of representations made at the time of sale is Suiter's affidavit, which states that "[a]t the time of purchase, GM, through its agents and representatives, presented the vehicle as being in perfect condition and free from defects" and "falsely represented to [him] that the specific model [he] purchased was the last of its kind and that it was being discontinued." (Dkt. 42-2 at 1–2; *see also* Dkt. 48 at 8 (Suiter's Declaration stating that the car was "presented as 'like new' and inspected by GM's certification process").) However, none of these representations involve facts about the express warranty period applicable to the subject vehicle. Nor does Suiter provide any "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" about how the car's CPO status alters the warranty periods set forth in GM's exhibits. Fed. R. Civ. P. 56(c)(1)(A).

- 21 -

2.  <u>"Failure to Properly Apply Virginia UCC Accrual Principles" Objection</u>

Suiter also objects to the fact that the R&R "does not meaningfully analyze whether CPO representations qualify as warranties extending to future performance under § 8.2-725(2)." (Pl.'s Objs. at 3.)  Virginia Code § 8.2-725, which codifies UCC § 2-725, sets forth Virginia's *statute of limitations* that bars untimely claims regarding contracts for sale.  *See* Va. Code Ann. § 8.2-725; UCC § 2-725.  Section 8.2-725(2) specifies that, when calculating the *statute of limitations* period to determine whether the plaintiff is barred from bringing suit, a breach of contract claim accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Va. Code Ann. § 8.2-725(2).  For breach of warranty claims, the breach "occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  *Id.*

However, Suiter's objection mistakenly conflates warranty coverage limitations and statutes of limitations.  GM's defense against Count I is the former, not the latter.  GM only argues that the MMWA claim is "barred by the coverage limitations in GM's Warranty."  (Dkt. 38 at 1.)  This is entirely distinct from an argument that the claim is barred by the state statute of limitations.  *See Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 534 (D.S.C. 2021) ("Defendant's argument seems to incorrectly conflate a duration limitation of a warranty with the statutory period within which legal proceedings may be timely initiated."); *see also Allstate*

*Prop. v. Ploutis*, 776 S.E.2d 793, 796–97 (Va. 2015) (holding that a "contractual period of limitations provided in Allstate's [insurance] policy" is not a "statute of limitations").

Virginia Code § 8.2-725 provides the statute of limitations period. It does *not* prescribe the durational limitation of the warranty coverage period, which is the period relevant to GM's Count I defense. Instead, the language of the written warranty itself determines the accrual, expiration, and other terms of the warranty coverage period. *See* 15 U.S.C. § 2301(6)(A) (defining "written warranty" as a "written affirmation of fact or written promise . . . that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time"); *Harrell*, 517 F. Supp. 3d at 534–35 ("[F]or a plaintiff to state a warranty claim, the defect or issue allegedly covered by the warranty must arise prior to the expiration of the warranty period," which is a "durational limit" that "appears in the express warranty.").

Accordingly, the R&R's Count I analysis appropriately relied on the terms of the identified express warranties rather than the language in § 8.2-725 discussing a "warranty extending to future performance." (R&R at 17.) This Virginia statute of limitations provision is entirely irrelevant to the court's analysis of whether the warranty coverage expired before Suiter's defects arose. *See Harrell*, 517 F. Supp. 3d at 534 (noting that "the statute of limitations does not in and of itself extend an express warranty"). And, as already discussed in the above section, Suiter does not provide any evidence to suggest that the subject vehicle's CPO status extended any of the applicable written warranties beyond April of 2024. (Pl.'s Objs. at 3.)

- 23 -

3.  "Fraudulent Concealment Tolling" Objection

Suiter's final objection to the R&R's Count I analysis discusses the equitable doctrine of tolling for fraudulent concealment.  (Pl.'s Objs. at 4.)   He contends that "[w]hether concealment occurred and whether it delayed discovery are fact issues not suitable for summary disposition at this stage."  (*Id.*)

The fraudulent concealment tolling doctrine seeks to prevent a defendant from concealing a fraud until after the statute of limitations period has passed.  *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995).  In cases where "'fraud has been concealed or is of such a character as to conceal itself,' and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud."  *Id.* (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874)).  This doctrine is "read into every *federal statute of limitation*."  *Id.* (emphasis added) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

For the same reasons that Virginia Code § 8.2-725 was irrelevant, fraudulent concealment tolling does not create a genuine issue of material fact in Count I's express warranty claim.  The fraudulent concealment tolling doctrine specifically applies to *statutes of limitations*, not warranty coverage limitations.  *See, e.g.*, *Newman v. Walker*, 618 S.E.2d 336, 336 (Va. 2005) (holding that a "defendant's affirmative misrepresentation about his identity at the scene of an automobile accident . . . tolls the running of the statute of limitations"); *Jones v. Saxon Mortg., Inc.*, 537 F.3d 320, 327 (4th Cir. 1998) ("[A] statute of limitations is tolled by a defendant's fraudulent concealment.").   This court does not find case law extending this

- 24 -

doctrine to warranty coverage periods.  In fact, courts have repeatedly held that various tolling provisions for Virginia statutes of limitations "do[] not apply to a contractual limitations period" like a warranty coverage period.  *Sethi v. Citizens Ins. Co. of Am.*, 157 F. Supp. 3d 501, 506 (W.D. Va. 2016); *see Ploutis*, 776 S.E.2d at 796–97 ("[B]y incorporating a period of limitations into the terms and conditions of their contract, the parties chose to exclude the operation of the statute of limitations and, in doing so, also excluded its exceptions." (cleaned up)); *Massie v. Blue Cross & Blue Shield of Va.*, 500 S.E.2d 509, 511 (Va. 1998).  Suiter does not point to any tolling provision found in the warranty agreement or contract between the parties. Therefore, the warranty period is not "tolled" in this case.

Accordingly, even when drawing all reasonable inferences in favor of Suiter, as required under Rule 56, the summary judgment record before the court shows no genuine dispute of material fact as to whether all express warranties applicable to the subject vehicle have expired. GM has carried its burden of demonstrating the absence of a genuine issue of material fact, *see Celotex Corp.*, 477 U.S. at 323, and Suiter is unable to demonstrate that even "a scintilla of evidence" suggesting that his Count I express warranty claim is not precluded by the expiration of the written warranties, *Anderson*, 477 U.S. at 252.  The court will overrule Suiter's objection to Count I and will adopt the recommendations set forth in the R&R for Count I's express warranty claim.

## B. Suiter's Objections to Count III's Negligence and Design Defect Claims

Next, Suiter objects to the R&R's Count III analysis and dismissal of his "negligence claims under Rule 12(b)(6) or the economic loss doctrine."  (Pl.'s Objs. at 4.)  Suiter

emphasizes the "liberal pleading standards" and argues that "[w]hether Defendant breached a
duty independent of contract requires factual development." (*Id.*)

Virginia's economic loss doctrine "bars parties from recovering in tort 'simply by
recasting a contract claim as a tort claim.'" *Hazaimeh v. U.S. Bank Nat'l Ass'n*, 94 F. Supp. 3d
741, 747 (E.D. Va. 2015) (quoting *Waytec Elecs. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459
F. Supp. 2d 480, 491 (W.D. Va. 2006)). If the loss is a "purely economic loss, for which the
law of contracts provides the sole remedy," the tort claim is barred. *Sensenbrenner v. Rust, Orling
& Neale, Architects, Inc.*, 374 S.E.2d 55, 58 (Va. 1988). In other words, "if the defendant
breaches a duty owned to the plaintiff only through a contractual agreement, the plaintiff may
not recover purely economic losses in a related tort action against the defendant." *Tidewater
Beverage Servs., Inc. v. Coca Cola Co.*, 907 F. Supp. 943, 947–48 (E.D. Va. 1995).

While injury to property or persons often enables tort recovery, Virginia courts have
clarified that the economic loss rule still applies in cases involving injury to *property* where
"damage is claimed because goods purchased fail to meet some standard of quality."
*Sensenbrenner*, 374 S.E.2d at 57; *see Burner v. Ford Motor Co.*, 52 Va. Cir. 301, 2000 WL 33259938,
at *2 (2000) (same). The Virginia Supreme Court has embraced the "other-property
exception" to the economic loss rule, which allows for tort recovery when the resulting
damage is to "property *other than the product itself*." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d
244, 265–66 (Va. 2019) (quoting *Sensenbrenner*, 374 S.E.2d at 55); Restatement (Third) of Torts:
Products Liability § 21 & cmt. e (1998) (stating that damages for "harm to property other than
the defective product itself" are not barred by the economic loss rule).

- 26 -

In his amended complaint, Suiter alleges that "[a]s a result of Defendants' negligence in the manufacture and design of the vehicle, Plaintiff has suffered financial loss, potential health hazards due to mold, and the risk of serious injury or death from a vehicle that does not lock into park or brakes properly." (Am. Compl. at 7.) This "financial loss" is pure economic loss, which stems from the duties established in the parties' contract for the purchase of the 2018 Chevrolet Malibu. (*See* Dkts. 48-1, 48-2, 38-1.) Specifically, the alleged defects creating the financial loss—the crack in the brake light, failure to lock in park, and shaking while braking—constitute mere damage to the defective product itself. *See Burner*, 2000 WL 32259938, at *3–4. There is no allegation of damage to property other than the subject vehicle itself. The "essence of [Suiter's] claim" for financial loss is that "he suffered a loss because the [car] did not function at the level he expected." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1183 (4th Cir. 1997). Thus, the extent of GM's liability for this loss is controlled by the warranties rather than by tort law, and the economic loss rule applies. *Id.*

Furthermore, while allegations of *actual* bodily injury would prevent application of the economic loss rule, Suiter's amended complaint only mentions "*potential* health hazards" and a "*risk* of serious injury." (Am. Compl. at 7.) These statements are entirely speculative, and do not include sufficient facts to plausibly allege bodily injury such that tort recovery is proper. *See NAP Chesterfield L.P. v. J.H. Martin & Sons, Contractors, Inc.*, No. CL99-285, 1999 WL 1486250, at *1–2 (Va. Cir. Ct. Nov. 18, 1999) (finding that injuries were purely economic where "the Plaintiffs' pleading prays for relief from threatened injury to persons, not actual injury to persons"); *see also Caudill v. Wise Rambler, Inc.*, 168 S.E.2d 257, 259 (Va. 1969) ("A

plaintiff's right of action for damages for personal injuries does not accrue until he is hurt."). Suiter's response brief and accompanying affidavit include additional facts: that the defects "caused the vehicle to roll unexpectedly," "abruptly cut off while driving," and contain "mold and mildew growth that caused Plaintiff respiratory distress." (Dkt. 42-1 at 2–3.) These new factual allegations were not included in Suiter's complaint or amended complaint. Therefore, the court may not consider these facts in ruling on GM's motion to dismiss. *See Marsh v. Va. Dep't of Transp.*, No. 6:14-cv-00006, 2014 WL 6833927, at *8 (W.D. Va. Dec. 3, 2014) ("If a plaintiff—even a pro se plaintiff—wants to add new claims, she must seek leave to amend her complaint, not slip them into an opposition brief.") (collecting cases); *Thornock v. JES Found. Repair*, No. 7:23-cv-00638, 2024 WL 1739755, at *7 (W.D. Va. Apr. 23, 2024) (holding that, when ruling on the motion to dismiss, the court may not consider additional facts that a *pro se* plaintiff included in its response brief). Thus, the only actual damage Suiter adequately alleges is the financial loss associated with the vehicle defects.

Where, as here, a plaintiff alleges that he has suffered "nothing more than disappointed economic expectations," the economic loss rule applies to prevent recovery under a negligence cause of action. *Sensenbrenner*, 374 S.E.2d at 58. Even when accepting all factual allegations in the amended complaint as true, Suiter did not allege sufficient facts to plausibly suggest that he has suffered more than pure economic loss, and the economic loss doctrine applies as a matter of law. The court will dismiss the Count III negligence claim.

- 28 -

### C. Suiter's Objections to the Effects of CPO Program on Warranties

Suiter's final objection overlaps with his first, in that it challenges the effects of GM's CPO program on the warranty coverage.  (Pl.'s Objs. at 4–5.)  Suiter specifically "objects to any analysis that treats the April 2018 delivery date as dispositive without considering the legal effect of GM's Certified Pre-Owned program in which the vehicle was sold to Plaintiff in 2022 under that very same CPO program."  (*Id.* at 4.)

#### 1.  MMWA Express Warranty Claim (Count I)

As the court has already discussed, Suiter provides no evidence supporting the existence of any express warranty that accrued after the April 2018 date—when the subject vehicle was delivered to the first owner—and that had not expired by the time Suiter discovered the alleged defects.  Nor is there any legal authority or evidence suggesting that the CPO program altered the duration of the warranties such that warranty coverage remained in place through May or June of 2024.  For the reasons delineated in Section III.A.1, there is no genuine issue of material fact as to whether Suiter's defects arose after Count I's express warranty periods expired, and there is no legal authority requiring the court to toll or restart the warranty period based on the fact that the subject vehicle was sold as "Certified Pre-Owned."

#### 2.  Virginia Lemon Law Claim (Count II)

To the extent that Suiter's objection is directed at Count II and the "lemon law rights period" under Virginia Code § 59.1-207.11 ("the Virginia Lemon Law" or "VMVWEA"), the summary judgment record shows that the statutory period began in April of 2018 and expired

before Suiter brought his claim. Suiter does not demonstrate any genuine dispute of material fact as to this timeline.

The Virginia Lemon Law seeks to protect consumers of motor vehicles by requiring manufacturers and other entities to respond to good-faith warranty complaints and promptly make repairs necessary to conform a vehicle to all applicable warranties. *See* Va. Code Ann. §§ 59.1-207.10, 59.1-207.12. To bring a claim under this statute, the consumer must "report any nonconformity to the manufacturer and pursue any rights provided for" in the Virginia Lemon Law during the "lemon law rights period." *Id.* § 59.1-207.11; *see id.* § 59.1-207.16 ("Any action brought under this chapter shall be *commenced within the lemon law rights period.*" (emphasis added)).

The "lemon law rights period" is defined as "the period ending 18 months after the date of the *original* delivery to the consumer of a *new* motor vehicle." *Id.* § 59.1-207.11 (emphasis added). Therefore, while a used car owner qualifies as a "consumer" that may bring a claim under the Virginia Lemon Law, the lemon law rights period is still measured as 18 months from the delivery of the *new* car to the *original* owner. *See id.*; *Subaru of Am., Inc. v. Peters*, 500 S.E.2d 803, 805–07 (Va. 1998). Here, the lemon law rights period started on April 21, 2018—the date of the original delivery to Adams of the new subject vehicle. (*See* Dkt. 49-1 at 2; Dkt. 49-2 at 1.) Thus, the period ended on October 21, 2019—almost three years before Suiter bought the subject vehicle in July of 2022. (*See* Dkts. 48-1, 48-2, 38-1.) And *even if* the lemon law rights period restarted when Suiter bought the car—which it did not—the period

- 30 -

still would have ended in January of 2024, months before he even discovered the defects and notified GM.

The Virginia Lemon Law statute provides for an extension of the lemon law rights period: (1) "if the manufacturer has been notified but the nonconformity has not been effectively repaired by the manufacturer, or its agent, by the expiration of the lemon law rights period," Va. Code Ann. § 59.1-207.13(C); or (2) if the consumer has partaken in good faith attempts to settle but these efforts have not resulted in resolution, *id.* § 59.1-207.16. Neither of these exceptions apply in this case. Moreover, Suiter does not provide any case law or statutory authority showing that the CPO status of the subject vehicle alters the lemon law rights period.

Overall, the evidence establishing the subject vehicle's warranty coverage and lemon law rights periods does not "present[] a sufficient disagreement to require submission to a jury." *Stewart v. MTR Gaming Grp., Inc.*, 581 F. App'x 245, 247 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 251–52). Rather, the evidence showing that both periods expired before Suiter experienced the alleged defects "is so one-sided that [GM] must prevail as a matter of law." *Id.* Therefore, the Virginia Lemon Law claim and the express warranty MMWA claim are both time-barred.

### D. Remaining Portions of the R&R

The court reviews the other portions of the R&R, to which neither party objects, to "satisfy itself that there is no clear error on the face of the record." *Diamond*, 416 F.3d at 315.

After a thorough review of the R&R, the applicable law, and the record, the court does not find any such error.

## IV.    Conclusion

For the foregoing reasons, the court will overrule Suiter's objections, (Dkt. 57), and adopt the R&R, (Dkt. 54), in its entirety.  The court will grant GM's dispositive motion as to Count II.  The court will grant in part and deny in part GM's dispositive motion as to Count I.  The court will grant GM summary judgment on Count I only insofar as Suiter alleges a MMWA claim based on breach of express warranty.  Summary judgment will be denied on the implied warranty portion of Count I.

The court will grant GM's motion to dismiss as to Counts III, V, and VI.  Counts III, V, and VI will be dismissed without prejudice.  Suiter will be granted limited leave to amend his complaint, but only for his Count III claim of negligence.  The court does not grant leave for Suiter to amend any other dismissed claims at this time.  Suiter may file an amended complaint within 14 days of the date of the accompanying Order.  If Suiter does not file an amended complaint by that date, the court will dismiss the Count III negligence claim with prejudice.

An appropriate Order will issue.

**ENTERED** this  12th  day of March, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

- 32 -